UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

JEFFREY TUBOLINO,

        Plaintiff,

v.

NANCY A. BERRYHILL,

        Defendant.

Case No. 18-cv-02511-RMI

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 23, 24

Plaintiff, Jeffrey Tubolino, seeks judicial review of an administrative law judge ("ALJ") decision denying his application for supplemental security income payments under Title XVI of the Social Security Act. Plaintiff's request for review of the ALJ's unfavorable decision was denied by the Appeals Council, thus, the ALJ's decision is the "final decision" of the Commissioner of Social Security which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (dkts. 10, 16), and both parties have moved for summary judgment (dkts. 23, 24). For the reasons stated below, the court will grant Plaintiff's motion for summary judgment, and will deny Defendant's motion for summary judgment.

## LEGAL STANDARDS

The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

**PROCEDURAL HISTORY**

As to the application before this court, in September of 2012, Plaintiff applied for supplemental security income payments based on disability, with the alleged onset date of September 28, 2012. *See Administrative Record*[1] *"AR"* at 114. The claim was denied initially and on reconsideration, and then denied again following a hearing before the ALJ. *See* Def.'s Mot. (dkt. 24) at 4. After a remand from the Appeals Council for a new hearing and a new decision, the ALJ conducted the second hearing, and then denied the application in a second decision dated January 11, 2017. *AR* at 19-31. Subsequently, the Appeals Council denied Plaintiff's request for any further review in a decision dated March 1, 2018. *Id*. at 1-3.

**SUMMARY OF THE RELEVANT EVIDENCE**

Plaintiff raises four closely related issues to the effect that the ALJ's improper rejection of the opinions of Plaintiff's treating and examining doctors, as well as the improper rejection of Plaintiff's testimony and that of his father, culminated in a Step-4 error where the ALJ incorrectly found that Plaintiff was capable of performing his past relevant work as a fish packer. *See* Pl.'s Mot. (dkt. 23) at 6. Accordingly, the following is a summary of the evidence relevant to the disposition of those claims.

*Medical Evidence from Treating Physicians*

On September 27, 2012, Plaintiff, who was homeless, sought treatment from Dana Romalis, M.D., at Santa Clara Valley Medical Center, and was diagnosed with a mood disorder

---

[1] The AR, which is independently paginated, has been filed in several parts as a number of attachments to Docket Entry #20. *See* (dkts. 20-1 through 20-11).

not otherwise specified, with Dr. Romalis noting, "mental illness appears severe." *AR* at 467-68. Dr. Romalis suspected that Plaintiff was either suffering from bipolar syndrome, or schizophrenia, or schizoaffective disorder, and in addition to referring Plaintiff for psychiatric consultation, Dr. Romalis prescribed Plaintiff with Depakote, which is intended to treat bipolar mania or epilepsy.[2] *Id*. at 468. One month later, Dr. Romalis observed problems with Plaintiff's judgment, insight, orientation, memory, as well as his mood and affect. *Id*. at 464. The same day, Plaintiff was treated by Viet Le, M.D., Ph.D., a psychiatrist at the Santa Clara Valley Medical Center. *Id*. at 465. Noting that Plaintiff had been chronically homeless since 2006, Dr. Le observed Plaintiff's affect as "mildly expansive" and characterized his insight as "limited." *Id*. Following an examination in December of 2012, Dr. Romalis expressed a suspicion that Plaintiff may be suffering from delusional disorder. *Id*. at 462. During the following months, in the first half of 2013, Dr. Le continued to treat Plaintiff and would renew the prescription for Depakote more than once, noting Plaintiff's mild hypomanic symptoms as well his limited insight and fluctuating affect. *Id*. at 506-15.

On the basis of his treatment relationship with Plaintiff, Dr. Le submitted a medical source statement on July 12, 2013, in which he opined as to Plaintiff's limitations due to his impairments. *Id*. at 501-04. Dr. Le wrote that he had been treating Plaintiff for the past nine months, and that examinations would take place every two to three months. *Id*. at 501. Noting that Plaintiff had reported having previously been diagnosed as suffering from bipolar disorder in 2006, Dr. Le wrote that he had observed, through mental status examinations, that Plaintiff was symptomatic for hypomanic mood and racing thoughts. *Id*. Dr. Le added these symptoms affect Plaintiff's behavior and his interactions with others, as well as being responsible for his poor adherence to treatment. *Id*. On the basis of these observations, Dr. Le assessed Plaintiff with an Axis-I diagnosis of bipolar disorder not otherwise specified, deferring his Axis-II and Axis-III evaluations, and evaluating Plaintiff with an Axis-IV assessment of chronic homelessness. *Id*. at 502.

---

[2] *See* www.depakote.com (last visited September 18, 2019 at 1:32 pm).

Additionally, assessing a GAF score of 47, Dr. Le opined that Plaintiff had marked[3] impairment-related limitations in a number of categories of functioning. *Id*. As to understanding and memory, Dr. Le found that Plaintiff had marked limitations in his ability to understand, remember, or carry out detailed instructions; maintain attention and concentration for the four 2-hour segments constituting the typical workday; perform within a schedule and maintain regular attendance; sustain an ordinary routine without special supervision; work in proximity to others without being unduly distracted by them; and, to complete a normal workday without interruptions from psychologically based symptoms. *Id*. at 502-03. By way of explanation, Dr. Le added that he had also found "evidence of cognitive impairment from chronic untreated symptoms." *Id*. at 503. Regarding social interaction, Dr. Le found that Plaintiff had marked limitations in his ability to interact appropriately with the general public; or to accept instructions and respond appropriately to criticism from supervisions; or to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; or to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. *Id*. By way of explanation here, Dr. Le noted Plaintiff's "[o]dd and gnarled affect." *Id*. While Dr. Le found Plaintiff to be moderately limited in activities of daily living, he found marked limitations in Plaintiff's ability to maintain social functioning, as well as his concentration, persistence, and pace. *Id*. Lastly, Dr. Le opined that as a result of his impairments or treatment, Plaintiff could be expected to be absent from work more than four days per month. *Id*. at 504. Dr. Le then signed and dated the statement, including his address and telephone number alongside his signature. *Id*.

*Medical Evidence from Examining Professionals*

On March 21, 2013, Plaintiff underwent a consultative psychological examination by Sara Bowerman, Ph.D., based on a referral by the state agency for social services and disability evaluation. *Id*. at 490. Following a full psychological examination, and the administering of a battery of diagnostic testing regarding visual-motor functioning, developmental disorders, neurological impairments, as well as memory and intelligence, Dr. Bowerman produced a detailed

---

[3] Limitations that impair the effective performance of the task incrementally for a total of more than 20% of a workday or workweek. *See id*.

report. *See id*. at 490-98. When delving into Plaintiff's psychiatric history, Dr. Bowerman wrote that Plaintiff reported "his psychiatric history began in 2004, when he was involved in a severe car accident and sustained a significant head injury," after which he was described by family and friends as, "out there" and "different." *Id*. at 490-91. Asked to describe a typical day in his life, Plaintiff noted that his days largely consist of "meal hopping," spending time in the library, and looking for a place to sleep. *Id*. at 492. In relation to the fact that Plaintiff reported vacillating between homelessness and "staying with his parents part-time," Dr. Bowerman observed that "[d]uring the interview, Mr. Tubolino gave the impression that he was having marked difficulty adjusting to his current circumstances," namely, difficulty adjusting to the psychological examination itself. *Id*. at 491. Further, Dr. Bowerman also observed that "[i]nformation obtained from Mr. Tubolino regarding interpersonal relationships indicated that his ability to relate [to others] is markedly impaired by his psychiatric symptoms." *Id*.

As to the mental status examination, Dr. Bowerman examined Plaintiff and found that his attention, insight, and concentration were poor, his affect was constricted, his thought processes were tangential and his memory appeared to be moderately to markedly impaired. *Id*. at 492. Dr. Bowerman administered the Wechsler Adult Intelligence Scale (4th Ed.) ("WAIS-IV"), which yielded a full-scale IQ score of 90, reflecting intellectual functioning in the average range. *Id*. at 493. As to Plaintiff's results on the Wechsler Memory Scale (4th Ed.) ("WMS-IV"), Dr. Bowerman found that Plaintiff's delayed memory index ("DMI"), which measures the ability to listen to oral information or view visual information and recall the information after delay of 20 to 30 minutes, operated in the extremely low range, alongside the bottom 1% of individuals in his age group. *Id*. at 494. In the measure of his immediate memory, auditory memory, and visual memory, Dr. Bowerman assessed Plaintiff as falling in the borderline range in each of these categories, placing him in the bottom three or four percent of individuals in his age group. *Id*. Likewise, as to logical memory, Dr. Bowerman found that Plaintiff scored in the bottom two percent of individuals in his age group. *Id*. at 495.

Given the results of the diagnostic testing, Dr. Bowerman noted a series of diagnoses and opinions. First, that Plaintiff's "scores suggest that he has difficulty remembering and carrying out

5

simple tasks." *Id*. Second, that Plaintiff suffered from four Axis-I psychological disorders: amnestic disorder not otherwise specified, bipolar disorder not otherwise specified, social phobia, alcohol dependence, and amphetamine abuse. *Id*. at 496. At Axis-IV, Dr. Bowerman assessed Plaintiff as also being afflicted with problems relating to social environment, health problems, financial problems, access to housing problems, and recent involvement with the legal system. *Id*. Plaintiff was then assessed at Axis-V as having a GAF score of 43. Third, as to functional limitations, Dr. Bowerman opined that Plaintiff is moderately to markedly impaired in his ability to understand, remember, and carry out complex instructions due to his mood, memory, and anxiety disorders. *Id*. at 497. Regarding his ability to respond appropriately to co-workers, supervisors, and the public in either a work-setting, or even in other settings, Dr. Bowerman found that "[h]is memory, mood, and anxiety disorders markedly impair his ability to interact with others in socially acceptable ways." *Id*.

Nearly three years later, in February of 2016, Plaintiff underwent a second consultative psychological examination, this time by Janine Marinos, Ph.D., and again, the purpose was "to provide diagnostic impressions to the Social Services Administration." *Id*. at 592-596. Like Dr. Bowerman, Dr. Marinos also wrote a detailed report which was based on a comprehensive review of Plaintiff's prior medical records, Dr. Marinos's own independent psychological evaluation, and her administration of the same diagnostic instruments used by Dr. Bowerman, namely, the WAIS-IV, the WMS-IV, and both parts of the Trail-Making Tests. *Id*. at 592. Given that Plaintiff had experienced homelessness "for some seven to eight years, after losing his job," Dr. Marinos also noted that Plaintiff largely spent his time seeking out churches where he can have a meal and then looking for places to sleep for the night. *Id*. When asked why he was applying for disability benefits, Plaintiff responded that he was "[s]eeking relief in everyday life, such as cleaner clothes, public transportation, healthier cooked foods, communication(s) (phone bill), hygiene, survival equipment (backpack, shoes, sleeping bag), [and] possibly housing if I can cope indoors." *Id*.

As to the diagnostic testing, Dr. Marinos measured Plaintiff as having a full scale IQ score of 93; finding him moderately impaired as to immediate and delayed recall for short stories, and mildly impaired as to his delayed visual memory. *Id*. at 595. On the basis of her examination,

review of Plaintiff's records, and diagnostic testing, Dr. Marinos diagnosed Plaintiff with two

Axis-I psychological disorders, namely, alcohol abuse in early remission and mood disorder not

otherwise specified. *Id*. Dr. Marinos deferred diagnostic impressions at Axis-II and Axis-III;

assessed chronic homelessness at Axis-IV; and assessed Plaintiff as having a GAF score of 50 at

Axis-V. *Id*. Based on these limitations, and because Plaintiff "seems to have settled into a

homeless lifestyle," Dr. Marinos opined that "it seems unlikely that he would respond

appropriately to usual work situations, e.g., maintaining regular attendance . . . [and] he may

require assistance in managing his funds should he be granted benefits." *Id*. at 596.

*Function Reports*

Plaintiff's father, David Tubolino, completed and submitted two third-party function

reports in relation to Plaintiff's disability application. *See id*. at 293-301, 348-56. In the first

report, dated December 26, 2012, Mr. Tubolino stated that he has occasion to see Plaintiff for

about one week every other month, and that otherwise Plaintiff lives and sleeps at "various

outdoor locations and in someone's vehicle on occasion." *Id*. at 293. Mr. Tubolino also noted that

Plaintiff is easily frustrated or annoyed, has difficulty focusing, does not handle stress well, and is

unable "to work or stay in one place for average periods of time," and that Plaintiff "[h]as been

this way since childhood, but [it is] more evident now." *Id*. at 293-94, 298. Mr. Tubolino

described Plaintiff's hobbies and interests as reading, watching movies, and spirituality, which

ordinarily engage Plaintiff's interests on a daily basis "unless in [a] depressed state." *Id*. at 297.

Explaining that "[c]oncentrating and talking [] can be challenging at times, causing [Plaintiff] to

be unsociable . . . [and] to become solitary," Mr. Tubolino added that Plaintiff has difficulty

remembering spoken instructions, and that he sometimes finds Plaintiff "gazing off into space, like

not being in the moment." *Id*. at 298-99.

In the second report, dated September 24, 2013, Mr. Tubolino reported that his son

continued to be homeless, and that his difficulty with instructions and his inability to "remain in

situations very long" continue to interfere with his ability to work. *Id*. at 348. Mr. Tubolino

described a typical day in Plaintiff's life as still involving "taking a shower somewhere, going to

the library for long periods . . . [then] to various churches for food . . . [and then to] find[] a place

to sleep somewhere outside." *Id.* at 349. He also related that Plaintiff's condition has "worsened over time," and that he remains "[p]hysically capable of doing things, but not mentally." *Id.* at 349-50, 353. As to Plaintiff's ability to follow instructions, Mr. Tubolino noted that Plaintiff "get's (sic) about half of what is instructed, on a good day." *Id.* at 353. In short, Mr. Tubolino reiterated that Plaintiff "[c]an't stay anywhere for very long," and that when experiencing stress, Plaintiff simply "shuts down." *Id.* at 354.

*Hearing Testimony*

Plaintiff appeared at a hearing before the ALJ on September 30, 2014 (*id.* at 77-106); and, following remand from the Appeals Council, Plaintiff appeared at a second hearing on July 27, 2016 (*id.* at 41-73). The second hearing began with the ALJ announcing that, Dr. Richard Cohen, a psychiatrist and an editor of a book on alcoholism, was appearing by telephone as a medical advisor. *Id.* at 40-41, 50-51. The ALJ then asked Plaintiff, "[d]o you have an address where you're living or are you living in a car or under a bridge" – Plaintiff responded, "I'm homeless and I'm nomadic and I don't have a camp. I sleep outside." *Id.* at 41. With that, the ALJ proceeded to question the medical expert, establishing first that Dr. Cohen had never met Plaintiff. *Id.* Based on his review of Plaintiff's medical records, Dr. Cohen somehow opined that Plaintiff's only medically determinable impairment was alcohol abuse. *Id.* at 42-43. Dr. Cohen explained that "it looks like . . . alcohol abuse . . . and it's important to understand that alcohol abuse causes mood instability. He's been diagnosed with the records (sic) with an independent bipolar disorder. Let's just say he has that but, you know, I feel like it's a substance-induced mood disorder." *Id.* The ALJ then put it to Dr. Cohen that "since alcohol can be a depressant for some people . . . when he's not drinking he's not depressed," with which Dr. Cohen agreed. *Id.* at 45.

Dr. Cohen then opined that Plaintiff's activities of daily living are only mildly impaired because he can do laundry, bathe, dress himself, take public transportation, and engage in shopping. *Id.* at 46. As to social functioning, Dr. Cohen opined that Plaintiff is only moderately impaired because he can spend time in libraries as well as going to churches for meals. *Id.* Regarding concentration, persistence, and pace, Dr. Cohen opined that Plaintiff's "attention span is a lot better than most people." *Id.* at 46. When asked by Plaintiff's counsel whether it was

8

possible for a person to suffer from substance abuse issues at the same time as bipolar disorder, Dr. Cohen responded, "You know, you'd be – I edited a textbook on alcoholism and you'd be a conspirator in the denial system, thinking that somebody is drinking because they have . . . a bipolar disorder and that's kind of – that's how an alcoholic thinks." *Id*. at 50-51. When pressed further, Dr. Cohen simply repeated that, "from looking at the totality of the records, I feel he has a substance abuse mood disorder." *Id*. at 51. When pressed again as to why then would so many physicians diagnose Plaintiff with bipolar disorder and repeatedly prescribe him with medication for that condition, Dr. Cohen, without explanation, simply repeated that "if this were my patient, and I looked at these records, oh, I wouldn't be giving him those medicines." *Id*. at 53-54.

Having excused Dr. Cohen, the ALJ asked Plaintiff, "Okay, Mr. Tubolino, so you heard the doctor on the phone basically [say] that you don't have bipolar disorder and that, essentially all of the symptoms that you're having are being caused by alcohol use. So can you tell me, during the periods of sobriety, what symptoms do you continue to have that you feel interfere with your ability to work?" *Id*. at 54. Plaintiff responded that, "[w]ell, yesterday is a good example . . . I started out the day . . . I wasn't quite depressed that morning . . . I go to get my basket . . . I walk around all day and I recycle cans . . . around 12:00 I get like this deep anxiety and like this feeling of impending doom . . . so I just sit down in the sun and I don't know what to do . . . this deep anxiety and I'm just sitting there . . . I take my meds and just start walking around . . . I start feeling a little better and then about two hours later [] I'm all hyper and like boom and like, yeah, you know, I'm just running around . . . enjoying life . . . loving it, you know." *Id*. at 55. Plaintiff clarified that "without the alcohol – take the alcohol aside, okay, I'm all pumped up, you know, then I can be all depressed and down again . . . depression hits me more in the morning, okay, and in the evenings and the anxiety is more in the daytime and something like that. And then my mood, it just goes like that." *Id*. at 56. When asked to opine about some triggers for his anxiety, Plaintiff mentioned observing conflicts and fights, and added that "it could be when no one is around and I just – like the library is closing . . . and I'm scared because now I don't know – I have to go – I have to change what I'm doing or something, I don't know." *Id*. at 60. The ALJ then asked Plaintiff if any of his treating physicians had ever expressed any uncertainty about his

United States District Court
Northern District of California

9

bipolar diagnosis, Plaintiff testified that they had not. *Id*. at 61. When asked whether he would be able to adhere to a schedule if he were placed in a work environment, Plaintiff responded that "it might work for a month . . . [b]ut then I would – the disease, it will slip in and I'll have some racing ideas and panic attacks and . . . I'll run away . . . because the way I see it now is if I build up a little bit, I get a relationship, a house, a car and I get my family and friends all pumped up and happy for me and then I lose it all, I can't handle that kind of disappointment again . . . [i]t's not happening, okay? It's not. I'm not going to do it . . . I can't adhere to any kind of schedule. It drives me nuts." *Id*. at 63-64.

The ALJ then inquired about Plaintiff's prior employment and noted that Plaintiff worked as a fish packer in 2002, a delivery truck driver in 2005, an arborist in 2006 and 2007, and, very briefly as a retail store employee in 2008. *Id*. at 65-66. The ALJ then asked, and the vocational expert ("VE") confirmed, that employment as a fish packer, hand packer, and tree trimmer involve little to no "dealing with the public," and for a delivery driver it would only be occasional. *Id*. at 67-71. Having no further questions for the VE, the ALJ allowed Plaintiff's counsel to pose a hypothetical question. *Id*. at 71-72. Counsel asked the VE if there would be any work at all that could be performed by a person limited to simple/repetitive tasks with marked impairments in their ability to interact with others and a moderate to marked impairment limiting that person to "about 15 to 25 percent of an 8-hour day or a 40-hour work week in their ability to respond appropriately to usual work situations and to changes in a routine work setting." *Id*. at 72. The VE responded that the hypothetical would preclude the ability to engage in any employment at all, and the hearing was concluded. *Id*.

*The ALJ Decision*

The ALJ decision that is the subject of this litigation began by noting that in its remand order, the Appeals Council had directed the ALJ to consider Plaintiff's amnestic disorder, social phobia, and substance abuse, as well as further discussing the opinion of Plaintiff's treating physician, Dr. Le. *Id*. at 19. The ALJ then proceeded to find that Dr. Le's diagnosis of Plaintiff was invalid because of the ALJ's impression that Dr. Le and his colleagues at the Santa Clara Valley Medical Center had abandoned their professional judgment and simply relied on Plaintiff's

account and nothing more to diagnose him with bipolar disorder. *Id*. at 22. Specifically, the ALJ noted that "[r]elying on his self-report, his examining doctor prescribed Depakote [a medication for bipolar disorder] but referred him to a psychiatrist for diagnosis." *Id*. In this regard, the ALJ found that "bipolar disorder seems to have entered the medical record largely due to the claimant's own reports, and the claimant's doctors have not independently verified the diagnosis." *Id*. at 25. Accordingly, the ALJ explained that in light of Dr. Cohen's expert testimony to the effect that Plaintiff did not suffer from bipolar disorder, "[w]ithout further corroboration . . . the undersigned does not find bipolar disorder to be a severe impairment but rather finds that [Plaintiff has a] mood disorder, stemming from the claimant's longtime drug and alcohol use, to provide a greater explanation for his residual symptoms." *Id*. In short, the ALJ found that "[w]hile examining doctors noted bipolar disorder, [a] clear psychiatric diagnosis is unclear." *Id*. at 27. To comply with the Appeals Council's remand order, the ALJ found "claimant's mood disorder[,] likely stemming from a history of drug and alcohol dependence[,] to be severe," however, as to Plaintiff's amnestic disorder, social phobia, claustrophobia, and anxiety, the ALJ found them to be non-severe because "there is little to no treatment for any of these conditions and they are supported only by claimant's subjective complaints." *Id*. at 24. The ALJ also arrived at the conclusion that "the claimant was unwilling – rather than unable – to maintain work activity . . . that he was homeless by choice, finding it to be easier than maintaining work and money . . . [and] that the prospect of work 'freaked' him out, but this appears to be based on his own perception rather than specific mental incapacity." *Id*. at 27.

The ALJ rejected Dr. Le's opinions regarding Plaintiff's functional limitations because of the notion that "Dr. Le's treatment notes from this period do not support" such "severe limitations." *Id*. at 28. Once again, the ALJ added that as to Plaintiff's symptoms, "the claimant's poor compliance and alcohol use likely consisted (sic) to their persistence." *Id*. Additionally, the ALJ expressed doubt that Dr. Le's questionnaire regarding Plaintiff's limitations was even completed by Dr. Le himself because of a notion that "Dr. Le's notes indicated that he gave this form to a social worker . . . and it is unclear if this person had a treating relationship with the claimant." *Id*. at 23, 28. The ALJ also gave "little weight" to Dr. Bowerman's opinions regarding

Plaintiff's limitations because "it is internally inconsistent and incompatible with the claimant's treatment notes from this period. For example, Dr. Bowerman notes marked social impairment; however, the claimant described having several friends, and no treating or evaluating provider has noted any specific social dysfunction during examinations." *Id*. at 29. Thus, the ALJ found that, likewise, Dr. Bowerman's "functional assessment appears to be largely based on the claimant's subjective claims during the exam." *Id*. The ALJ gave "some weight" to Dr. Marinos's opinion in general, but rejected "her finding that the claimant would be unable to maintain a consistent schedule [because it] is unsupported by anything other than the claimant's subjective allegations." *Id*. The "greatest weight" was given to the opinion of the non-examining consultant, Dr. Cohen, who "evaluated the entire medical record" and expressed the "opinion that bipolar disorder is not fully supported in the record." *Id*. at 30. Lastly, the ALJ rejected the limitations expressed by Plaintiff's father in both function reports because Plaintiff's "allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty." *Id*. Accordingly, the ALJ found that Plaintiff retained the functioning capacity to perform a full range of skilled and semi-skilled work at all exertional levels, but such that requires no more than occasional public contact; and, therefore, that he could still his perform his past relevant work as a fish packer. *Id*. at 26.

**THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY**

A person filing a claim for social security disability benefits ("the claimant") must show the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or is expected to last for twelve or more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909.[4] The ALJ must consider all evidence in the claimant's case record to determine disability (*see id*. § 416.920(a)(3)), and must use a five-step sequential evaluation process to determine whether the claimant is disabled (*see id*. § 416.920). "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

---

[4] The regulations for supplemental security income (Title XVI) and disability insurance benefits (Title II) are virtually identical though found in different sections of the CFR. For the sake of convenience, the court will generally cite to the SSI regulations herein unless noted otherwise.

Here, the ALJ evaluated Plaintiff's application for benefits under the required five-step sequential evaluation process. *AR* at 20-31. At Step One, the claimant bears the burden of showing he has not been engaged in "substantial gainful activity" since the alleged date the claimant became disabled. *See* 20 C.F.R. § 416.920(b). If the claimant has worked and the work is found to be substantial gainful activity, the claimant will be found not disabled. *See id.* Here, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. *AR* at 22.

At Step Two, the claimant bears the burden of showing that he has a medically severe impairment or combination of impairments. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). The ALJ found that Plaintiff suffered from the following severe impairments: alcohol-induced mood disorder, history of substance abuse disorder in remission, and alcohol dependence in recent remission. *AR* at 22.

At Step Three, the ALJ compares the claimant's impairments to the impairments listed in appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). The claimant bears the burden of showing her impairments meet or equal an impairment in the listing. *Id.* If the claimant is successful, a disability is presumed and benefits are awarded. *Id.* If the claimant is unsuccessful, the ALJ assesses the claimant's RFC and proceeds to Step Four. *See id.* § 416.920(a)(4)(iv), (e). Here, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. *AR* at 25. Next, the ALJ determined that Plaintiff retained the RFC to perform the full range of skilled and unskilled work at all exertional levels, except that Plaintiff's public contact should only be occasional. *Id.* at 26.

Ultimately, the ALJ had no need to proceed to Step Five, because, at Step Four, the ALJ determined that based on the testimony of the VE, Plaintiff is capable of performing his past relevant work as a fish packer, and therefore, that Plaintiff had not been disabled, as defined in the Social Security Act, from September 28, 2012, through the date of the issuance of the ALJ's decision, January 11, 2017. *Id.* at 31.

**ISSUES PRESENTED**

Plaintiff presents four related issues for review and argues that the ALJ improperly rejected the opinions of Plaintiff's treating and examining doctors; improperly rejected Plaintiff's testimony as well as that of his father; and, that because of these errors, the ALJ incorrectly concluded that Plaintiff was capable of continuing his previous employment as a fish packer. *See* Pl.'s Mot. (dkt. 23) at 14-19, 21, 23.

**DISCUSSION**

Defendant contends that "the ALJ discussed all the opinions, weighed them, and gave reasons for the weight he gave each opinion consistent with the regulations and case law, and his reasons had the support of substantial evidence." Def.'s Mot. (dkt. 24) at 6. Pointing out that when reviewing Plaintiff's application, the ALJ was only required, under 20 C.F.R. §§ 416.927(c)(2), (e)(2)(ii), to give "good reasons" for the weight given to treating source opinions, Defendant argues that this court should affirm because "the ALJ gave good reasons for the weight he gave to the medical source opinions." *Id*. at 6. Additionally, Defendant submits that, under 20 C.F.R. § 416.927(c)(3), the opinion of non-examining sources can be considered to constitute substantial evidence when they discuss and consider other evidence and explain their conclusions with reference to that evidence. *Id*. at 6-8. Thus, referring to the disagreement between the professionals who examined and treated Plaintiff and non-examining consultants – such as Dr. Cohen – Defendant argues that because "Dr. Cohen reviewed the entire record . . . the ALJ quite properly deferred substantially to Dr. Cohen's conclusions." *Id*. at 7. Defendant also argues that the rejection of the opinions of the examining and treating doctors was not error because the ALJ properly found that their conclusions relied on Plaintiff's "symptom allegations rather than specific findings." *Id*. at 8-11. Regarding Plaintiff's testimony, Defendant maintains that it was properly rejected because the ALJ correctly found that Plaintiff's "activities and statements" were fairly indicative that he was out of work and homeless by choice rather than it being due to any medically determinable impairment. *Id*. at 12. Lastly, Defendant asserts that the testimony of Plaintiff's father was also properly rejected because the ALJ provided a germane reason in that the limitations expressed by Plaintiff's father were inconsistent with the opinion of Dr. Cohen and

14

other non-examining state agency consultants (which were not discussed by the ALJ). *Id.* at 13. Thus, Defendant maintains that Plaintiff can resume employment as a fish packer. *Id.* at 13-14.

In order to properly reject the opinion of a treating or examining doctor, it is incumbent on an ALJ to express clear and convincing reasons that are supported by substantial evidence in the record. *See Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017); *Ghanim v. Colvin*, 763 F.3d 1154, 1160-61 (9th Cir. 2014); *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008); *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). Further, the ALJ is required to consider a series of factors when determining how much weight to afford the treating physician's medical opinion including: the length of the treatment relationship; the frequency of examination; the nature and extent of the treatment relationship; the supportability of the physician's opinion with medical evidence; and the consistency of the physician's opinion with the record as a whole. *Ghanim*, 763 F.3d at 1161. An ALJ can satisfy this burden by setting forth a detailed summary of the facts and conflicting clinical evidence, the interpretation thereof, and the resulting findings. *Trevizo*, 871 F.3d at 675; *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989); *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986). It should be noted that conflicts between a treating provider's notes and opinions may constitute an adequate reason to discredit the opinions of a treating physician or another treating provider. *See Ghanim*, 763 F.3d at 1161. It should also be noted that if a treating provider's opinions are based "to a large extent" on an applicant's self-reports and not on clinical evidence, and the ALJ finds the applicant not credible, the ALJ may discount the treating provider's opinion. *Id.* at 1162; *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); *Bayliss*, 427 F.3d at 1217. "However, when an opinion is not more heavily based on a patient's self-reports than on clinical observations, there is no evidentiary basis for rejecting the opinion." *Ghanim*, 763 F.3d at 1162 (citing *Ryan*, 528 F.3d at 1199-1200).

When assessing a claimant's credibility regarding the intensity of symptoms, an ALJ is required to engage in a two-step analysis. *See Ghanim*, 763 F.3d at 1163; *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012); *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). Initially, the ALJ "must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other

symptoms alleged." *Ghanim*, 763 F.3d at 1163 (quoting *Vasquez*, 572 F.3d at 591). If the claimant satisfies the first test, and there is no evidence of malingering, the ALJ can then only reject a claimant's symptom testimony by giving specific, clear and convincing reasons for the rejection. *Ghanim*, 763 F.3d at 1163; *see also Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). Thus, general findings will not suffice; instead, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. *Ghanim*, 763 F.3d at 1163; *see also Lester*, 81 F.3d at 834. In assessing a claimant's credibility, an ALJ may consider a range of factors, including the ordinary techniques of credibility evaluation, such as a reputation for lying, prior inconsistent statements about symptoms or other testimony by the claimant that appears untrue; a failure to seek treatment that is either unexplained or poorly explained; and, by noting pertinent inconsistencies based on claimant's daily activities. *See Ghanim*, 763 F.3d at 1163; *Smolen*, 80 F.3d at 1284. Lastly, as to lay witness evidence, in order "[t]o reject third-party reports of a claimant's impairments" or other lay witness evidence, 'an ALJ need only give reasons that are germane to each witness.'" *Revels v. Berryhill*, 874 F.3d 648, 655 (9th Cir. 2017) (quoting *Molina*, 674 F.3d at 1114). However, an ALJ may not simply discredit lay testimony as not supported by medical evidence in the record. *See Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009).

### Lay Witness Evidence

In rejecting the lay witness evidence from Plaintiff's father, the ALJ relied, in part, on the notion that Plaintiff's "allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty." *AR* at 30. The court notes that it is difficult to conceive of more concrete proof of an obvious inability to interact appropriately with co-workers, peers, and the general public, or proof of the inability to otherwise adhere to the norms and schedules of the workplace, than Plaintiff's decade of homelessness spent searching for meals and places to sleep. The ALJ also based the rejection of Mr. Tubolino's function reports on the notion that even if Plaintiff is as limited as his father describes, "it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons." *Id*. In this regard, the ALJ concluded that "in general, the third party statement regarding the claimant's limited daily

activities is considered to be outweighed by the medical evidence and other factors discussed in this decision." *Id*. The ALJ's reasoning for rejecting the lay witness evidence here was error because incorrectly stating that Mr. Tobolino's statements regarding Plaintiff's limitations are not capable of objective verification is not a reason that is germane to this witness. S*ee Revels*, 874 F.3d at 655; *see also Molina*, 674 F.3d at 1114. Further, as discussed below, Mr. Tubolino's statements regarding Plaintiff's limitations were not only not "outweighed by the medical evidence," they were substantially consistent with the opinions of all of the treating or examining doctors. Accordingly, the court finds that the ALJ erred in rejecting the lay witness evidence in this case by failing to express any reasoning that would be germane to this witness.

### Plaintiff's Testimony

The ALJ rejected Plaintiff's testimony by stating that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *AR* at 27. The ALJ reasoned that Plaintiff's account of "social isolation, and alleged significant anxiety around others," would at best support a "finding of moderate limitations in this area" because Plaintiff was still "capable of interacting with his various treating and examining professionals, suggesting no greater limitation in this area." *Id*. at 25. The ALJ also noted that Plaintiff's alleged limitations are inconsistent with the fact that Plaintiff still speaks to family members frequently, that he occasionally says hello to people passing him by on the street, and that "he reported going to the library, church, coffee shops, stores, and parks." *Id*. at 25-26.

Here, because there was no evidence of malingering, the ALJ was required to give specific, clear and convincing reasons for the rejecting Plaintiff's testimony. *See Ghanim*, 763 F.3d at 1163; *Lingenfelter*, 504 F.3d at 1036. First, the court finds that the ALJ erred by making general rather than specific findings in rejecting Plaintiff's testimony wholesale and without pointing to any evidence that could potentially undermine even portions of Plaintiff's testimony. As mentioned above, general findings will not suffice. *Ghanim*, 763 F.3d at 1163; *see also Lester*, 81 F.3d at 834. Second, aside from falling short of the requisite degree of specificity, the court finds that the ALJ's reasoning in rejecting any portion of Plaintiff's testimony was unclear and unconvincing.

1    Having set forth an account of Plaintiff's testimony above, the court will only note here that

2    speaking to family members, greeting a stranger on the street, accepting meals from churches,

3    buying something from a store, and going to a park, are not activities that can conceivably be

4    understood to diminish or undermine any of Plaintiff's testimony.

5         Additionally, it should be noted that the ALJ speculated that Plaintiff's symptoms are

6    rooted in alcohol consumption and that "alcohol use *likely* [contributed] to their persistence." *AR*.

7    at 28 (emphasis added). Once again, a thorough review of the record reveals no basis on which the

8    ALJ could have reasonably concluded that Plaintiff's symptoms would not exist but for his history

9    of alcohol dependence. In fact, Dr. Le, Plaintiff's treating psychiatrist, specifically opined that

10    drug or alcohol use was not even a contributing factor to Plaintiff's disability, let alone its cause.

11    *See AR* at 504. The only foundation in the record on which such a notion could possibly be based

12    would be the opinion of Dr. Cohen, the non-examining testifying medical expert; which, as

13    discussed below, does not constitute substantial evidence because it did not make sense, was not

14    attended with any explanation, and could not be explained by any other evidence in the record.

15    Accordingly, the court finds that the ALJ erred in rejecting Plaintiff's testimony by failing to

16    provide specific, clear, and convincing reasons.

17                      **Medical Evidence**

18         As to bipolar disorder – with which Plaintiff was independently diagnosed by Dr. Romalis

19    (physician), Dr. Le (psychiatrist), and Dr. Bowerman (psychologist) – the ALJ erred in the finding

20    that the condition was non-severe based on the misconception that "bipolar disorder seems to have

21    entered the medical record largely due to the claimant's own reports, and the claimant's doctors

22    have not independently verified the diagnosis." *See AR* at 25. Because the bipolar diagnosis was

23    found disagreeable by Dr. Cohen, the ALJ was required to base its rejection, if at all, on specific

24    and legitimate reasons supported by substantial evidence. *See Trevizo*, 871 F.3d at 675; *Bayliss*,

25    427 F.3d at 1216; *see also Reddick*, 157 F.3d at 725. The court finds that there is no basis

26    whatsoever in the record upon which the ALJ could reasonably have concluded that Plaintiff

27    succeeded in convincing three doctors to simply note a bipolar diagnosis based only on Plaintiff's

28    assurance that he was in fact bipolar. Accordingly, the court finds that the ALJ erred in rejecting

Dr. Le's medical diagnosis of bipolar disorder not otherwise specified.

As to Dr. Le's functional limitations opinion – finding marked limitations in areas of comprehension, memory, attention, concentration, social interaction, and the ability to sustain a routine – the ALJ rejected Dr. Le's opinions, reasoning that "Dr. Le's treatment notes from this period do not support" such "severe limitations." *AR* at 28. Once again, because Dr. Cohen formulated a differing opinion as to Plaintiff's limitations, the ALJ needed to support any rejection of Dr. Le's opinion with specific and legitimate reasons supported by substantial evidence. *See Trevizo*, 871 F.3d at 675. However, the only discussion of Dr. Le's treatment notes appears elsewhere in the ALJ's opinion (*see id*. at 23-24); and nothing in that discussion in any way undermines Dr. Le's conclusions. In sum, the ALJ points out that on a number of occasions, Dr. Le's notes reflect that Plaintiff had "fair hygiene and grooming," "was cooperative," "maintained fair eye contact," or that his "[s]peech was normal." *Id*. at 23-24. Having reviewed Dr. Le's treatment notes, the court sees no inconsistency between Dr. Le's notes and his conclusions. Accordingly, the court finds that the ALJ's finding to that effect was not based on substantial evidence.

Regarding the ALJ's finding that Dr. Le's questionnaire about Plaintiff's limitations may have not even been completed by Dr. Le himself because his "notes indicated that he gave this form to a social worker . . . and it is unclear if this person had a treating relationship with the claimant," (*id*. at 23, 28) the court finds that the ALJ erred as Dr. Le's notes and the questionnaire itself do not support such an interpretation. Dr. Le's notes indicate that at some unspecified time Plaintiff "turned in [a] questionnaire from his SSI attorney for filling out," this phrase is followed by an arrow pointing to the initials, "SW." *See id*. at 506. It is hardly clear from this note whether this was even the questionnaire being presently discussed; or, if so, whether SW served as an intermediary to whom it would be handed before or after Dr. Le would complete and sign it; or, if SW would complete it at Dr. Le's direction while Dr. Le would then sign it. It would strain the imagination to conclude that Dr. Le would have written a patient note to the effect that a questionnaire regarding his patient was completed and signed under his name by another person. The medical source statement in which Dr. Le expressed his functional limitation opinion was

signed by Dr. Le himself, not by any other person (*see id.*), and alongside his signature and name, Dr. Le also wrote his telephone number and address by hand. Because there is no evidence in the record to support it, the ALJ erred in finding that Dr. Le's signed medical source statement may not be his own because of a cryptic note elsewhere saying that some questionnaire was at some point given to "SW" to be filled out. Thus, the court finds that the ALJ likewise erred in rejecting Dr. Le's testimony as to Plaintiff's functional limitations by failing to provide specific and legitimate reasons based on substantial evidence in the record.

Having found that the ALJ erroneously rejected Plaintiff's testimony, the lay witness testimony, and the bipolar diagnosis and functional limitations opined by Dr. Le, Plaintiff's treating psychiatrist, the court will turn to the ALJ's rejection of the opinions of Dr. Bowerman and Dr. Marinos, the examining psychologists. As stated, the opinions of treating or examining doctors that are not contradicted, can only be rejected based on clear and convincing reasons that are supported by substantial evidence in the record. *Trevizo*, 871 F.3d at 675; *Ghanim*, 763 F.3d at 1160-61. Here, as to Dr. Bowerman's uncontroverted diagnoses of Plaintiff's amnestic disorder, social phobia, and anxiety, the ALJ failed to give any clear or convincing explanation based on any evidence for finding each to be non-severe, explaining only that "there is little to no treatment for any of these conditions and they are supported only by claimant's subjective complaints." *AR*. at 24. Dr. Bowerman examined Plaintiff, subjected him to a battery of psychological testing, and then formally diagnosed him with these conditions, as well as with having deficits in attention, concentration, and comprehension. *See AR* at 495. No evidence in the record undermines these diagnoses in any way. Instead, the court notes that Dr. Bowerman's diagnosis of amnestic disorder is consistent with the deficits in Plaintiff's memory that were evidenced by the WMS-IV testing conducted by both Dr. Bowerman and Dr. Marinos. The court also notes that Dr. Bowerman's diagnoses of social phobia and anxiety disorder are consistent with the record as a whole. Accordingly, it was error for the ALJ to find these conditions to be non-severe for the stated reason that Plaintiff received little treatment (essentially faulting Plaintiff for being homeless and having mental impairments), or by stating that the diagnoses were only based on Plaintiff's own account when they were not.

The ALJ's stated reason for rejecting Dr. Bowerman's opinion regarding Plaintiff's limitations was that "it is internally inconsistent and incompatible with the claimant's treatment notes from this period. For example, Dr. Bowerman notes marked social impairment; however, the claimant described having several friends, and no treating or evaluating provider has noted any specific social dysfunction during examinations." *AR* at 29. The ALJ once again noted in this regard that Dr. Bowerman's "functional assessment [also] appears to be largely based on the claimant's subjective claims during the exam." *Id.* As mentioned above, because Dr. Cohen formed his own contrary opinion as to Plaintiff's limitations at the hearing, in order to reject Dr. Bowerman's opinion, the ALJ needed to express specific and legitimate reasons based on substantial evidence in the record. Here, the ALJ's reliance on purportedly contradictory "treatment notes from this period" amounts to little more than cherry picking from the notes of treating physicians and suggesting that observations such as "good grooming" or "cooperative and calm," operate to undermine that physician's expressly stated opinions about functional limitations. Once again, it is not reasonable to consider the opinion of an examining psychologist regarding her patient's level of social dysfunction as undermined in any meaningful way by simply pointing out that at some point in time that same patient claimed to have "several friends." Thus, the court finds that the ALJ likewise erred in rejecting Dr. Bowerman's opinion as to Plaintiff's functional limitations by failing to express any specific and legitimate reasons based on substantial evidence in the record.

Following another psychological examination, another record review, and more diagnostic testing, Dr. Marinos opined that because Plaintiff "seems to have settled into a homeless lifestyle . . . it seems unlikely that he would respond appropriately to usual work situations, e.g., maintaining regular attendance . . . [and] he may require assistance in managing his funds should he be granted benefits." *Id.* at 595-96. In this regard, while the ALJ gave some unspecified degree of weight to some portions of the opinions and findings of Dr. Marinos in general, the ALJ expressly rejected "her finding that the claimant would be unable to maintain a consistent schedule [because it] is unsupported by anything other than the claimant's subjective allegations." *Id.* at 30. First, it should be noted that the ALJ failed to address Dr. Marinos's conclusion that Plaintiff would be unable to

respond appropriately to usual work situations. *See id.* at 29-30. Second, as mentioned above, because Dr. Marinos's opinions about Plaintiff's functional limitations differed from those expressed by Dr. Cohen at the hearing, the ALJ was required to set forth specific and legitimate reasons supported by substantial evidence in the record in order to reject those opinions. The ALJ's stated reasons – the repeated notion that yet another doctor has rendered a diagnosis and opinion based on nothing more than her patient's subjective complaints – neither constitute specific and legitimate reasoning, nor are based on any evidence in the record. Instead, the record is clear that Dr. Marinos performed an independent psychological examination, administered a battery of diagnostic tests, reviewed Plaintiff's prior medical records, and submitted a detailed report which unequivocally stated that "[t]he following [test] results appear to provide a reasonable estimate of his current level of functioning." *Id.* at 593. Accordingly, the court finds that the ALJ erred in rejecting Dr. Marinos's diagnostic and opinion evidence regarding Plaintiff's impairments and limitations by failing to provide specific and legitimate reasons for doing so.

To reject all of the above-described evidence, the ALJ gave the "greatest weight" to the opinion of the non-examining consultant, Dr. Cohen, who reviewed Plaintiff's records and concluded that Plaintiff's only impairment was alcohol abuse (*id.* at 42-43), and testified that "it's important to understand that alcohol abuse causes mood instability . . . [and] you know, I feel like it's a substance-induced mood disorder." *Id.* at 42-43. Dr. Cohen also opined that Plaintiff's activities of daily living are only mildly impaired because he can do laundry, bathe, dress himself, take public transportation, and engage in shopping. *Id.* at 46. As to social functioning, Dr. Cohen concluded that Plaintiff is only moderately impaired because he can spend time in libraries and go to churches for meals. *Id.* Regarding concentration, persistence, and pace, Dr. Cohen somehow opined that Plaintiff's "attention span is a lot better than most people." *Id.* at 46. As to the possibility of a person suffering from both substance abuse issues and bipolar disorder, Dr. Cohen mentioned his textbook on alcoholism and simply stated that "You know, you'd be . . . you'd be a conspirator in the denial system, thinking that somebody is drinking because they have . . . a bipolar disorder and that's kind of – that's how an alcoholic thinks." *Id.* at 50-51. In essence, the rationale for Dr. Cohen's only explanation for his opinions was simply to repeat, "I feel he has a

substance abuse mood disorder." *Id.* at 51; *see also id.* at 42-43. In turn, the ALJ's decision only stated that Dr. Cohen's opinion is given great weight because "bipolar disorder is not fully supported by the record," and because Dr. Cohen's "opinion as to the claimant's residual limitations are also consistent with the treatment history and medical records." *Id.* at 30.

First, the court will note that because Dr. Cohen did not have occasion to examine Plaintiff, and because he did not venture to explain his opinions, or otherwise state a basis on which they may be understood to rest, the court finds Dr. Cohen's opinions to be without evidentiary value. Second, even if that were not the case, the ALJ here effectively rejected a treating physician's opinion, in addition to the opinions of two other examining doctors, in favor of a non-examining medical advisor's opinion that was wildly inconsistent with the record as a whole. Rejecting a treating physician's opinion in favor of a non-examining physician's opinion, without more, is by itself legal error. *See Lester*, 81 F.3d at 830-31 (ALJ's rejection of treating physician's opinion was improper where it was based solely upon the testimony of a non-treating, non-examining medical advisor); *see also Id.* at 833; *see also Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990) ("non-examining physicians' conclusion[s], with nothing more" do not constitute substantial evidence controverting an examining physician's opinion.). Accordingly, for these reasons, it was error for the ALJ to effectively reject Dr. Le's opinion, in addition to the opinions of Dr. Bowerman and Dr. Marinos, in favor a non-examining medical advisor's opinion which has no apparent evidentiary basis in the record.

### Nature of Remand

The upshot of the court finding that the ALJ erroneously rejected all of the above-described evidence is that the ALJ also erred in determining that Plaintiff retained the functioning capacity to perform a full range of skilled and semi-skilled work at all exertional levels that would require no more than occasional public contact, and therefore, that Plaintiff could still his perform his past relevant work as a fish packer. *AR* at 26, 31. Thus, having found that the ALJ committed the above-described errors, the court must now decide if remand for further proceedings is appropriate. It is well established that "[i]f additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded [for further

proceedings].” *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981). It is, however, equally well established that courts are empowered to affirm, modify, or reverse a decision by the Commissioner, “with or without remanding the cause for a rehearing.” 42 U.S.C. § 405(g); *see also Garrison v. Colvin*, 759 F.3d 995, 1019 (9th Cir. 2014). Generally, remand with instructions to award benefits has been considered when it is clear from the record that a claimant is entitled to benefits. *Id.*

The credit-as-true doctrine, announced in *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396 (9th Cir. 1988) (“*Varney II*”), provides that when “there are no outstanding issues that must be resolved before a proper disability determination can be made, and where it is clear from the administrative record that the ALJ would be required to award benefits if the claimant's excess pain testimony were credited, we will not remand solely to allow the ALJ to make specific findings regarding that testimony . . . [instead] we will . . . take that testimony to be established as true.” *Id.* at 1401. The doctrine promotes fairness and efficiency, given that a pointless remand for further proceedings would unduly delay much needed income for those unable to work and yet entitled to benefits. *Id.* at 1398. The doctrine has been held to also apply to medical opinion evidence, in addition to claimant testimony. *See Hammock v. Bowen*, 879 F.2d 498, 503 (9th Cir. 1989). The standard for applying the rule to either is embodied in a three-part test, “each part of which must be satisfied in order for a court to remand to an ALJ with instructions to calculate and award benefits: (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.” *Garrison*, 759 F.3d at 1020.

It should also be noted that “the required analysis centers on what the record evidence shows about the existence or non-existence of a disability.” *Strauss v. Comm'r of the Soc. Sec. Admin.*, 635 F.3d 1135, 1138 (9th Cir. 2011). Thus, even though all conditions of the credit-as-true rule might be satisfied, remand for further proceedings would still be appropriate if an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled.

24

*Garrison*, 759 F.3d at 1021. On the other hand, it would be an abuse of discretion for a district court to remand a case for further proceedings where the credit-as-true rule is satisfied and the record affords no reason to believe that the claimant is not, in fact, disabled. *Id.*

**Record Development**

The first part of the credit-as-true test requires the court to determine whether the record has been fully developed and if further administrative proceedings would serve any useful purpose. In light of the fact that Plaintiff has been found markedly limited in his ability to interact with others and respond appropriately to usual work situations or changes in the work setting by his own account, by his father's account, and in the opinion of his treating physicians, and two independent examining doctors, the court finds that the evidentiary record has been fully developed. Further, because the VE testified that there would be no work in the national economy for a person with such limitations (*see AR* at 72), the court finds that further administrative proceedings would serve no useful purpose in this case. Accordingly, the court finds that this element of the credit-as-true test has been satisfied.

**Reasons for Rejecting the Evidence**

The second part of the credit-as-true test requires the court to determine if the ALJ has failed to provide legally sufficient reasons for rejecting the evidence, whether claimant testimony or medical opinion. As discussed above, the ALJ in this case provided no legally sufficient reasoning for rejecting any of this evidence. Therefore, the court finds that this element of the test is also satisfied.

**The Effect on Disability Determination**

The final part of the credit-as-true test requires the court to determine whether the ALJ would be required to find Plaintiff disabled on remand if the improperly discredited evidence were credited as true. Here, crediting as true Plaintiff's testimony, the testimony of his father, as well as the medical diagnoses and opinions of his treating and examining doctors, would indeed require a finding of disability at Step-5 based on the testimony of the VE. The VE testified that a person with marked limitations in the ability to interact with others and moderate to marked limitations in the ability to appropriately respond to usual work situations and changes in the routine would not

be able to function in any workplace, and that there would be no work in the national economy for such a person. Accordingly, the court finds that all three parts of the credit-as-true test are satisfied.

**Evaluation of the Record as a Whole**

Upon finding that all elements of the credit-as-true standard are satisfied, this court must then evaluate the record as a whole in order to determine whether the record gives rise to any serious doubt that a claimant is, in fact, disabled. *See Garrison*, 759 F.3d at 1020-21 *see also Fluker v. Berryhill*, No. 16-cv-01472-JCS, 2017 U.S. Dist. LEXIS 161302, at *110-12 (N.D. Cal. Sep. 29, 2017); and, *Reed v. Berryhill*, No. 16-cv-06710-MEJ, 2017 U.S. Dist. LEXIS 181277, at *43 (N.D. Cal. Nov. 1, 2017).

The record in this case presents no reason to entertain any doubt that Plaintiff is in fact disabled. Plaintiff has been reliably diagnosed by Dr. Le with bipolar disorder with evidence of cognitive impairment; Dr. Bowerman reliably diagnosed amnestic disorder, bipolar disorder, social phobia, alcohol dependence, and amphetamine abuse; and, Dr. Marinos reliably diagnosed alcohol abuse in early remission and mood disorder not otherwise specified. In sum, all three diagnoses were harmonious in that they found Plaintiff to be suffering from several overlapping impairments of a behavioral and cognitive nature. Further, all three doctors, as well as Plaintiff's father, have opined in agreement that Plaintiff's impairment-related limitations preclude his ability to respond appropriately to usual work situations or maintain regular attendance. Specifically, Plaintiff's treating psychiatrist found that Plaintiff's hypomanic mood and racing thoughts affect his ability to interact with others. Dr. Romalis opined that Plaintiff may also be suffering from a delusional disorder. Plaintiff's father reported that concentrating and talking can be challenging for Plaintiff, causing him to become frustrated, solitary, and to run away, noting that Plaintiff is unable to stay anywhere for very long. Plaintiff testified to the same effect, however, as mentioned, his decade of solitude and homelessness, spent searching for food and places to sleep, is itself the ultimate and undeniable confirmation of the diagnoses and functional limitations opinions of each his treating and examining doctors. Thus, because a review of the record as a whole gives rise to no serious doubt that Plaintiff is in fact disabled, remand for immediate

payment of benefits is warranted.

## CONCLUSION

For the reasons stated above, the court **GRANTS** Plaintiff's motion for summary judgment, **DENIES** Defendant's motion for summary judgment, **REVERSES** the ALJ's determination and **REMANDS** this matter for calculation and award of benefits.

A separate judgment will issue.

**IT IS SO ORDERED.**

Dated: September 25, 2019

ROBERT M. ILLMAN
United States Magistrate Judge